[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 14-15701

_____

D.C. Docket No. 1:13-cv-02598-CAP-LTW

HELGA M. GLOCK,

                 Plaintiff-Appellant,

versus

GLOCK, INC.,
GLOCK PROFESSIONAL, INC.,
CONSULTINVEST, INC.,

                 Defendants-Appellees.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(August 17, 2015)

Before ED CARNES, Chief Judge, ROSENBAUM, Circuit Judge, and SMITH,[*] District Judge.

ROSENBAUM, Circuit Judge:

Gaston Glock created the Glock 17 handgun for the Austrian army in 1982.[1]  Four years later, Glock's guns arrived in the United States.[2]

Gaston's[3] divorce followed a similar course.  In 2011, Gaston and his ex-wife Helga began their divorce proceedings in Austria.  But those proceedings came to the United States even faster than Glock's handguns.  This case involves what happened once they arrived.

## I.

The American litigation started small, when, on March 18, 2013, Helga filed a miscellaneous proceeding under 28 U.S.C. § 1782, seeking to discover evidence

---

[*] Honorable C. Lynwood Smith, Jr., United States District Judge for the Northern District of Alabama, sitting by designation.

[1] Paul M. Barrett, *Glock, the Rise of America's Gun* 9-13 (2013).  The gun was unique among firearms at that time.  Built in large part from plastic, the gun was lighter and easier to fire than other handguns on the market.  *Id.*  It also contained fewer parts and could hold seventeen bullets in its magazine, in comparison to significantly fewer bullets that some other handguns could carry.  *Id.*  The Glock gun also differed from other guns on the market in that it lacked a traditional safety.  *Id*. at 31.

[2] *Id.* at 50.  Within four years of their arrival in the United States, Glock firearms worked their way into American pop culture in *Die Hard 2*, when Bruce Willis's character John McClane made the remark, "That punk pulled a Glock 7 [sic] on me.  You know what that is?  It's a porcelain gun made in Germany.  Doesn't show up on your airport X-ray machines, here, and it cost more than you make in a month."  http://www.imdb.com/title/tt0099423/quotes (last visited Aug. 15, 2015).  Ironically, the statement was factually inaccurate in just about every way.

[3] Because Gaston Glock, Helga Glock, and several Glock corporate entities are involved in this case, this opinion refers to Gaston and Helga Glock by their first names to avoid confusion.

from Glock, Inc., Glock Professional, Inc., and Consultinvest, Inc. (collectively, "Glock Entities"), in the United States for use in Gaston and Helga's Austrian divorce proceedings. Ultimately, the Glock Entities did not challenge Helga's right to obtain the items she sought[4] and instead entered into a protective order that limited Helga's use of any materials that the Glock Entities marked "confidential" to proceedings "to which [Helga] is a party" (the "Protective Order").

But that was not the end of the United States litigation. About a year and a half after Helga filed her § 1782 application, she filed a separate RICO[5] lawsuit, in the United States, against Gaston and the Glock Entities ("the RICO Action"). Helga then returned to the § 1782 court on October 13, 2014, to seek authorization to allow her to disclose the documents she obtained in that litigation to her RICO attorney, for potential use in the RICO Action.

On October 30, 2014, the magistrate judge granted the motion in a paperless order. Apparently later that same day, the Glock Entities filed their response

---

[4] When Helga initially served the authorized subpoenas on the Glock Entities, they objected. In response, Helga filed a motion to compel. Originally, the Glock Entities opposed the motion because, among other reasons, they believed that Helga could not use in the Austrian proceedings the discovery she sought since the Austrian proceedings had reached Austria's highest court, which would not accept or review new evidence. After the Glock Entities filed their response, though, the Austrian court reinstated Helga's proceedings. As a result, the Glock Entities agreed to produce some documents and began negotiating a protective order with Glock. They also asked the court to refrain from ruling on the motion to compel, but, after a hearing, the district court granted the motion to compel. The court also required the parties to confer and present an agreed protective order to the court. The parties filed a joint protective order that the court adopted on November 18, 2013.

[5] A RICO lawsuit is an action filed under the Racketeer Influenced and Corrupt Organizations Act.

opposing Helga's use of the documents in connection with the RICO Action. Among other arguments, the Glock Entities asserted that, as a matter of law, documents obtained under § 1782 may not be used in domestic litigation, and even if they could, the Protective Order precluded the use of the § 1782 documents in Helga's domestic litigation. They also suggested that modifying the Protective Order would "intrud[e] on the prerogative" of the district judge in the RICO Action to control discovery in that case.

On November 8, 2014, the magistrate judge vacated her earlier paperless order but then entered a written order granting Helga permission to use the documents in the RICO Action. The order found that the Protective Order "did not limit [Helga's] use of the documents produced in this case to the Austrian Proceedings" but instead permitted the court to authorize use in a proceeding without reference to the foreign or domestic nature of the proceeding. The order further "rejected" the Glock Entities' argument that granting her use of the documents would intrude on the RICO Action judge's prerogatives.

The Glock Entities filed objections to the magistrate judge's order pursuant to Rule 72(a), Fed. R. Civ. P. Among other points, they contended that the order was contrary to law because § 1782 prohibits documents obtained for use in foreign proceedings to be used in litigation in the United States.

4

The district judge sustained the objections of the Glock Entities and concluded that the magistrate judge's determination that Helga could use evidence obtained in a § 1782 proceeding for a separate civil lawsuit in the United States was "contrary to law." In addition, the district court opined with respect to the Protective Order that although it did not expressly exclude use of the documents in civil lawsuits in the United States, it must be construed to prohibit such use since it was entered into in the context of a § 1782 action. Nevertheless, the district court stated, "This order does not preclude Helga Glock from seeking the documents in the [RICO] Action." Helga now appeals the district court's order.

## II.

Because Congress has granted broad discretion to district courts to grant an application under § 1782, this Court normally reviews the grant or denial of assistance for an abuse of discretion. *United Kingdom v. United States*, 238 F.3d 1312, 1319 (11th Cir. 2001). But to the extent the district court's decision was based on an interpretation of the § 1782 statute, our review is *de novo*. *See Consorcio Ecuatoriano de Telecomunicaciones S.A. v. JAS Forwarding (USA), Inc.*, 747 F.3d 1262, 1268 (11th Cir. 2014).

We review an order interpreting a protective order for an abuse of discretion. *See FTC v. AbbVie Prods. LLC*, 713 F.3d 54, 61 (11th Cir. 2013). "A district court abuses its discretion if it applies an incorrect legal standard, applies the law in an

5

unreasonable or incorrect manner, follows improper procedures in making a determination, . . . makes findings of fact that are clearly erroneous . . . misconstrues its proper role, ignores or misunderstands the relevant evidence, [or] bases its decision upon considerations having little factual support." *Id.* (citations and internal quotation marks omitted).

### III.

This case raises two major issues: first, whether § 1782 precludes the use, in civil litigation in the United States, of evidence previously obtained under the statute; and second, if not, whether the Protective Order entered by the § 1782 court prohibits the use, in civil litigation in the United States, of the materials procured under the § 1782 application in this case.

### A.

We begin by considering what, if any, limitations § 1782 imposes on the later use, in United States civil litigation, of documents obtained pursuant to § 1782. To address this question, we must start with the statutory language. *Owens v. Samkle Auto. Inc.*, 425 F.3d 1318, 1321 (11th Cir. 2005). For if it answers our question, we end our analysis with the statutory language as well. *Id.*

In relevant part, § 1782 provides,

> The district court of the district in which a person resides or is found may order him to give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal . . . .

> The order may prescribe the practice and procedure, which may be in whole or part the practice and procedure of the foreign country or the international tribunal, for taking the testimony or statement or producing the document or other thing.  To the extent that the order does not prescribe otherwise, the testimony or statement shall be taken, and the document or other thing produced, in accordance with the Federal Rules of Civil Procedure.

28 U.S.C. § 1782(a).  The plain language of this statute creates a procedure by which a person may obtain discovery in the United States "for use in a proceeding in a foreign or international tribunal."  Though it is clear from the statutory language that the law does not also establish a method for procuring discovery for use in a domestic proceeding, we find nothing in the language of § 1782 that purports to limit later uses of evidence that have been properly obtained under § 1782.  Had Congress intended to restrict the use of evidence previously obtained under § 1782 to proceedings in foreign or international tribunals, it easily could have expressed that intention in any number of ways, even by simply adding the word "only" or "solely" to the phrase "for use in a proceeding in a foreign or international tribunal."  But it did not do that.

On the other hand, neither did Congress include a sentence in the statute providing that once discovery is lawfully received under § 1782, it may be used for other legal purposes, including United States litigation.  Instead, the statute is entirely silent on the issue of whether material procured under § 1782 may be used after it is lawfully obtained and used for the purpose for which it was obtained.

7

This is not surprising because, throughout the history of the law, Congress was not focused on addressing what, if anything, could be done with documents that were previously lawfully obtained under the statute. Rather, "Section 1782 is the product of congressional efforts, over the span of nearly 150 years, to provide federal-court assistance in gathering evidence for use in foreign tribunals." *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 247, 124 S. Ct. 2466, 2473 (2004). The current embodiment of the law reflects the policy choice to "provide efficient means of assistance in our federal courts for litigants involved in international litigation and [to] prompt foreign courts to follow our generous example and provide similar assistance to our court systems." *In the Matter of the Application of Malev Hungarian Airlines*, 964 F.2d 97, 99 (2d Cir. 1992) (citing S. Rep. No. 1580, 88th Cong., 2d Sess. (1964), *reprinted in* 1964 U.S.C.C.A.N. 3782, 3792-94; *In re Letter Rogatory from the Justice Court., Dist. of Montreal, Canada*, 523 F.2d 562, 564-66 (6th Cir. 1975)). Nothing in the statutory language or in the Senate Report accompanying the law suggests that Congress ever specifically contemplated whether documents previously obtained under § 1782 could later be used in civil United States proceedings.

And, apparently, none of our sister circuits have addressed this issue, either. So we consider the analogy of how domestic litigation works. First, though, we pause to distinguish between the concepts of *using* evidence and *admitting*

8

evidence in court proceedings: A party may *use* evidence—whether or not it is *admissible* in court under the Federal Rules of Evidence—to develop a theory of the case, to prepare a complaint, to lead it to admissible evidence, to help it to settle a case, and to accomplish other aspects of prosecuting or defending a case. That fact, however, does not mean that the court will *admit* the evidence or even that the evidence is potentially admissible. Indeed, our discovery rules expressly contemplate the use of inadmissible evidence in prosecuting or defending a case. *See* Fed. R. Civ. P. 26(b)(1) ("Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence.").

As a general rule, in United States litigation, to help prosecute or defend their lawsuits, parties may use any evidence they lawfully possess.[6] If, for example, a plaintiff obtains documents in discovery from a defendant in one case, nothing precludes her from using that evidence in a wholly separate lawsuit against the same defendant or a different party, even though she would not have had those documents to use in the second case had she not lawfully received them as discovery in the first case. The law does not require her to rediscover the documents in the second case. Nor must she apply to the court in either lawsuit

---

[6] Of course, evidence subject to a protective order of a court, a confidentiality agreement, or otherwise legally protected may not be used in litigation that the order or agreement does not authorize.

9

before being able to, say, draft a complaint in the second case based on information contained in the documents discovered in the first case.  This is so even though no rule or law expressly authorizes a party to use, in furtherance of litigation, evidence that it lawfully possesses, whether as a result of earlier litigation or other circumstances.

Similarly, if a party lawfully possesses evidence that he would not be able to procure through discovery because, for example, the opposing party no longer had the records in its possession, nothing prevents him from using that evidence to further his lawsuit.  And that makes sense.  As the Federal Rules of Civil Procedure suggest, goals of our system of civil litigation include "secur[ing] the just, speedy, and inexpensive determination" of the proceeding.  *See* Fed. R. Civ. P. 1.  Allowing parties to use, for purposes of litigation, documents they have lawfully obtained, regardless of whether they could have obtained them through discovery in the case in which they use them, furthers these goals.  We see no reason why a different rule should apply to the use, in United States litigation, of documents that were previously lawfully obtained under § 1782.

Nor are we persuaded by the Glock Entities' argument based on the District of Columbia Circuit's decision in *In re Letter of Request from Crown Prosecution Service of the United Kingdom*, 870 F.2d 686 (D.C. Cir. 1989).  They characterize that decision as having held that the district court "did not abuse its discretion by

not entering a 'protective order to guard against improper use of the evidence in auxiliary or unrelated proceedings here or abroad. The district court's order does not permit the Commissioners to do anything but send the evidence to the British prosecutors . . . and any other use by them would require court permission.'" The Glock Entities' Brief at 20 (quoting *In re Letter of Request from Crown Prosecution Serv. of United Kingdom*, 870 F.2d 686, 693 n.11 (D.C. Cir. 1989)) (alterations made by the Glock Entities). Critically, the omitted parts of the quotation are citations to the transcript of the district court's order. In other words, in *In re Letter* the District of Columbia Circuit was construing the district court's specific § 1782 order in that case, not opining generally on the availability, for later use in United States proceedings, of materials procured under § 1782.

The Glock Entities also fire off another argument for why evidence lawfully obtained under § 1782 should not be able later to be used in United States litigation. It does not hit the mark, either.

The Glock Entities contend that the third *Intel*[7] factor dictates against the conclusion we reach today. In *Intel*, the Supreme Court explained that once a party satisfies § 1782's statutory requirements to obtain discovery, the district court has the authority to grant a § 1782 application, but whether then to do so falls within the district court's discretion. *See id.*, 542 U.S. at 264, 124 S. Ct. at 2482-83. To

---

[7] *Intel Corp.*, 542 U.S. 241, 124 S. Ct. 2466.

guide the district court's exercise of its discretion, the Supreme Court set forth four factors for consideration. *See id.* at 264-65, 124 S. Ct. at 2483. The third *Intel* factor[8] suggests evaluating whether the § 1782 application "conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States." *Id.* at 264-65, 124 S. Ct. at 2483. According to the Glock Entities, construing § 1782 in a way that does not prohibit later use, in United States proceedings, of evidence obtained under the statute would allow parties to circumvent domestic discovery rules, so we should reject such a construction.

We acknowledge that a § 1782 applicant could attempt to abuse the statute to obtain documents outside the discovery procedures set forth in the Federal Rules of Civil Procedure. But it naturally follows from the existence of the third *Intel* factor that this kind of subterfuge is a valid reason to reject a § 1782 application in the first place. Parties concerned in a particular case that a § 1782 applicant is

---

[8] The other three *Intel* factors include the following:

> (1) Whether "the person from whom discovery is sought is a participant in the foreign proceeding," because "the need for § 1782(a) aid generally is not as apparent as it ordinarily is when evidence is sought from a nonparticipant"; (2) "the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance"; . . . and (4) whether the request is otherwise "unduly intrusive or burdensome."

*In re Clerici*, 481 F.3d at 1334 (quoting *Intel Corp.*, 542 U.S. at 264-65, 124 S. Ct. at 2483).

attempting to use foreign litigation as a ruse for obtaining discovery in the United States without complying with the usual procedures of the Federal Rules of Civil Procedure can and should bring evidence of such chicanery to the § 1782 court's attention.

And even when no evidence of deception exists, nothing prevents a party from seeking to negotiate a protective order precluding the evidence from being used in United States civil litigation, particularly if the party has reason to believe that it risks exposure to United States litigation based on the evidence produced. Should negotiations fail, a party, for good cause, may also ask the § 1782 court to enter a protective order prohibiting use, in United States proceedings, of documents obtained under the statute. *See* Fed. R. Civ. P. 26(c)(1). The judge can then decide whether, under the particular circumstances of the case, she believes the entry of such an order to be appropriate. Just as courts have substantial experience controlling discovery abuse in domestic litigation, we have no doubt that district courts can similarly root out sham applications under § 1782.

When subsequent challenges arise, the § 1782 court, having entered the § 1782 order and, if applicable, the governing protective order, is in the best position to quickly evaluate allegations of improper use of § 1782 and the meaning of any governing protective order. Nor does the § 1782 court's resolution of these challenges somehow impermissibly infringe on the authority of the district court

involved in the succeeding substantive United States civil litigation.  As previously explained, allowing "use" of evidence for litigation is not the same thing as "admitting" evidence in litigation.  Our system does not require a party to "rediscover" evidence that it has properly obtained, so the substantive United States court's authority is not implicated prior to the filing of the subsequent lawsuit.  And once the substantive case has been filed, it is the substantive United States court that makes all decisions regarding the admissibility of evidence, though it may choose to do so, in part, if it wishes, based on the conclusions of the § 1782 court regarding whether a litigant improperly used § 1782 for the purpose of obtaining United States discovery that otherwise would not have been authorized.

But a rule that would categorically hold that documents lawfully obtained under § 1782 can never be used in United States civil litigation lacks a basis in the statutory language and has significant potential to adversely affect the goals and efficiency of United States litigation.  For one thing, it would create the specter of requiring a civil version of a *Kastigar* hearing[9] every time that civil litigation in the United States occurred after evidence was produced under § 1782.  In other words,

---

[9] A *Kastigar* hearing is a type of hearing held in criminal cases.  It is named for *Kastigar v. United States*, 406 U.S. 441, 92 S. Ct. 1653 (1972).  In a *Kastigar* hearing, the United States must demonstrate that none of the evidence it used to obtain an indictment or that it plans to use at trial derived from evidence procured from a defendant pursuant to the terms of an immunity agreement, to ensure that the defendant's Fifth Amendment privilege against self-incrimination is not violated.  *See United States v. Schwartz*, 541 F.3d 1331, 1357 (11th Cir. 2008).

the party alleged to have used the evidence obtained under § 1782 would have to prove that none of its evidence could be traced back to the § 1782 evidence. Courts are busy enough without having to engage in such undertakings on a regular basis.

Along the same lines, a blanket rule prohibiting the use of evidence obtained under § 1782 would create a perverse incentive for a party responding to a § 1782 order to flood the applicant with evidence in an effort to insulate itself from United States litigation by precluding the requesting party's ability to use any of the evidence obtained in any future United States litigation.

The restrictions on subsequent use of evidence obtained under § 1782 urged here by the Glock Entities are simply not supported by statutory text, legislative history, conventional discovery practice, or policy considerations. In short, we find that § 1782 does not preclude, as a matter of law, the use of evidence procured pursuant to it in subsequent United States civil litigation.[10]

---

[10] In a single footnote in their brief, the Glock Entities suggest that Helga, in fact, obtained evidence under § 1782 with the intention all along of using it in the United States RICO litigation. In particular, they assert, "The fact that [Helga] filed a 354 page complaint in the RICO Action, which was not drafted overnight, suggests that she long ago made the decision to file an action against the U.S. Glock Entities in the United States." First, this passing reference is not sufficient to preserve the Glock Entities' argument. *See Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1319 (11th Cir. 2012). Second, even if the issue were not waived, the mere fact that Helga's RICO complaint was 354 pages, in and of itself, does not show that Helga obtained the evidence under § 1782 for the purpose of using it in a later RICO complaint. Indeed, a year and a half went by between Helga's filing of her § 1782 application and the filing of the RICO complaint. While drafting a 354-page complaint certainly takes time (though some, including Blaise Pascal, might say that drafting a shorter complaint requires more time,

## B.

Since § 1782 does not limit use of the documents to foreign proceedings, we must consider whether the Protective Order precluded Helga from using the § 1782 evidence in United States civil litigation. In relevant part, the Protective Order provides,

> Disclosure of "Confidential" information and embodiments thereof . . . shall be restricted solely to the following persons who agree to be bound by the terms of this Order, unless additional persons are stipulated by counsel or authorized by the Court . . . and ***solely for use in a proceeding to which Applicant is a party (a "Proceeding")***, provided, however, that if Applicant desires to use such documents in connection with Proceedings other than the proceedings currently pending in Austria (*i.e.*, the proceedings for spousal support [3C135/11d, before the District Court Villach]; division of assets [40FAM 231/12s, before the District Court Villach]; changes to trust documents [22Cg 213/11 g, before the Klagenfurt Regional Court], and the revocation of share transfer [20Cg 180/11 I, before the Klagenfurt Regional Court], collectively referred to herein as the "Austrian Proceedings"), she shall first request and obtain leave of the Court to do so . . . .

(emphasis added).

As the district judge acknowledged, the language of the Protective Order does not expressly preclude Helga from using the § 1782 evidence in United States civil litigation. By defining "Proceeding" as any "proceeding to which [Helga] is a

---

*see Provincial Letters*: Letter XVI (Dec. 4, 1656)), it does not necessarily require eighteen months.

16

party," the Protective Order, on its face, authorizes Helga "to use" the § 1782 evidence in any litigation anywhere in the world, in which she is involved, provided that she first obtains leave of court to do so. Here, she procured the permission of the presiding magistrate judge.

But the district judge reasoned, and the Glock Entities urge on appeal, that § 1782 precludes the use of evidence obtained under it in United States civil litigation, and since the Protective Order was entered into in the context of a § 1782 proceeding, the terms of the Protective Order must necessarily be coextensively limited with the bounds of § 1782. This argument rises or falls with the notion that documents obtained under § 1782 may never be used in domestic civil litigation. But as we have explained, that is not a construction of § 1782 that we find to be supported by the law. So it cannot serve to narrow the plain terms of the Protective Order.

## IV.

Because the district court's rulings were erroneous as a matter of law, we must reverse the district court's order sustaining the Glock Entities' objections to the magistrate judge's order granting Helga's motion for leave to use § 1782

evidence in the RICO Action.  Ultimately, the § 1782 evidence authorized for use in the RICO Action, like the Glock gun,[11] is here to stay.

**REVERSED.**

---

[11] According to the Glock website, "approximately 65% of police departments" in the United States use Glock firearms.  https://us.glock.com/products/sector/law-enforcement (last visited Aug. 15, 2015).

# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

ELBERT PARR TUTTLE COURT OF APPEALS BUILDING
56 Forsyth Street, N.W.
Atlanta, Georgia 30303

Douglas J. Mincher
Clerk of Court

For rules and forms visit
www.ca11.uscourts.gov

August 17, 2015

MEMORANDUM TO COUNSEL OR PARTIES

Appeal Number: 14-15701-GG
Case Style: Helga Glock v. Glock, Inc., et al
District Court Docket No: 1:13-cv-02598-CAP-LTW

**This Court requires all counsel to file documents electronically using the Electronic Case Files ("ECF") system, unless exempted for good cause.** Enclosed is a copy of the court's decision filed today in this appeal. Judgment has this day been entered pursuant to FRAP 36. The court's mandate will issue at a later date in accordance with FRAP 41(b).

The time for filing a petition for rehearing is governed by 11th Cir. R. 40-3, and the time for filing a petition for rehearing en banc is governed by 11th Cir. R. 35-2. Except as otherwise provided by FRAP 25(a) for inmate filings, a petition for rehearing or for rehearing en banc is timely only if received in the clerk's office within the time specified in the rules. Costs are governed by FRAP 39 and 11th Cir.R. 39-1. The timing, format, and content of a motion for attorney's fees and an objection thereto is governed by 11th Cir. R. 39-2 and 39-3.

Please note that a petition for rehearing en banc must include in the Certificate of Interested Persons a complete list of all persons and entities listed on all certificates previously filed by any party in the appeal. See 11th Cir. R. 26.1-1. In addition, a copy of the opinion sought to be reheard must be included in any petition for rehearing or petition for rehearing en banc. See 11th Cir. R. 35-5(k) and 40-1.

Counsel appointed under the CRIMINAL JUSTICE ACT must file a CJA voucher claiming compensation for time spent on the appeal no later than 60 days after either issuance of mandate or filing with the U.S. Supreme Court of a petition for a writ of certiorari (whichever is later).

Pursuant to Fed.R.App.P. 39, costs taxed against appellees.

The Bill of Costs form is available on the internet at www.ca11.uscourts.gov

For questions concerning the issuance of the decision of this court, please call the number referenced in the signature block below. For all other questions, please call Eleanor M. Dixon, GG at (404) 335-6172.

Sincerely,

DOUGLAS J. MINCHER, Clerk of Court

Reply to: Jeff R. Patch
Phone #: 404-335-6161

OPIN-1A Issuance of Opinion With Costs